# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| HERMAN DAVID LOMAX, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No: 08 C 3540 |
| v. ) | |
| ) | Magistrate Judge Jeffrey Cole |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Herman David Lomax, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423(d), and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a). Mr. Lomax asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

### I.

### PROCEDURAL HISTORY

Mr. Lomax applied for DIB and SSI on January 26, 2005, alleging that he had been disabled since April 30, 2004, due to a hernia, a bad stomach, carpal tunnel syndrome, and trouble breathing and eating. (Administrative Record ("R.") 94, 126).[1] His application was denied initially and upon

---

[1] Mr. Lomax previously filed an application for SSI in October of 2003, and one for DIB the following month. (R.13). Those claims were denied at the initial stages and Mr. Lomax took no further action. (R. 13, 109).

reconsideration. (R. 77-80, 82-86). Mr. Lomax continued pursuit of his claim by filing a timely request for hearing on June 19, 2003. (R. 75).

An administrative law judge ("ALJ") convened a hearing on June 15, 2007, at which Mr. Lomax, represented by counsel, appeared and testified. (R. 289-355). In addition, Cheryl Hoiseth testified as a vocational expert. (R. 340-351). On November 29, 2007, the ALJ issued a decision finding Mr. Lomax not disabled because he could still perform his past work in retail security, as well as other jobs that exist in significant numbers in the national economy. (R. 13-31). This became the final decision of the Commissioner when the Appeals Council denied Mr. Lomax's request for review of the decision on June 13, 2008. (R. 4-6). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Lomax has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## EVIDENCE OF RECORD

### A.
### Vocational Evidence

Mr. Lomax was born on May 18, 1957, making him forty-five years old at the time of the ALJ's decision. (R. 94). He has a GED. (R. 130). His work history consists mostly of temporary, day labor jobs. (R. 126). Most recently, he worked in security at a clothing store for about six months, ending in April or May of 2003 or 2004. (R. 126, 301). Mr. Lomax stated that he no longer worked there because business was slow and they laid him off. (R. 126, 302).

### B.
### Medical Evidence

In November of 2003, Mr. Lomax went to an outpatient clinic, complaining of an inguinal

right hernia and lower back pain. He recited a history of carpal tunnel syndrome, hypertension, and esophagitis as well. The note, like many in the record, is mostly illegible, but it appears the hernia was "reducible" – an uncomplicated hernia that can be returned by manipulation. www.mercksource.com. (R. 152).

Dr. Mahesh Shah performed a consultative examination on Mr. Lomax in connection with his previous application for benefits on January 20, 2004. Mr. Lomax told the doctor he had a history of difficulty keeping food down, a hernia, high blood pressure, and shortness of breath, and that he had been diagnosed with carpal tunnel syndrome six years earlier at Cook County Hospital. (R. 155-56). The exam was essentially normal. Mr. Lomax stood 5' 8" tall and weighed 130 pounds. Blood pressure was normal at 130/80. He walked normally. (R. 156). Range of motion in the spine was normal, and straight leg raising was negative. There was a full range of motion in all extremities. He could squat, and heel and toe walk normally. His grasp and grip were normal, as was sensation in his hands. (R. 158). Motor strength was normal in all extremities. (R. 158). Dr. Shah indicated there was no evidence of carpal tunnel syndrome, that Mr. Lomax's hernia was uncomplicated but could limit his lifting and gave him discomfort when he bent forward. The doctor thought his gastric complaints might be do to his history of alcohol use or perhaps a peptic ulcer. (R. 158). A chest x-ray showed the lungs were clear with no infiltrate, but the diaphragm was slightly flattened. Dr. Shah thought there might be evidence of early emphysematous changes. (R. 160).

In February of 2004, Mr. Lomax sought treatment for difficulty swallowing. He also reported a history of carpal tunnel syndrome and hypertension, but took no medication for either. Again, the attending physician thought his problem might be due to a history of alcohol use. (R. 172).

3

In July 2004 Mr. Lomax underwent elective esophagogastroduodenoscopy for achalasia – a disease of the esophagus that makes swallowing difficult. The balloon dilation was successful, and a follow-up procedure was scheduled for August. (R. 243). That procedure was also successful, And Mr. Lomax was instructed to report to the emergency room with any unusual symptoms. (R. 241). Mr. Lomax was treated for gastrointestinal bleeding in September 2004. He underwent a gastroscopy, locating a gastric ulcer. He was given six units of blood in the intensive care unit. He was stabilized, and discharged in good condition on Amoxicillin and Prevacid (R. 176).

In January of 2005, gastric endoscopy revealed evidence of erosive espophagitis. (R. 266). And Mr. Lomax apparently had hernia surgery in April 2005 – there is no actual record of it, only a reference in subsequent notes – after postponing it a few times. (R. 210-212).

Mr. Lomax had another consultative exam in July of 2005, this time with Dr. M.S.Patil. Mr. Lomax complained of dyspnea after walking 2-3 blocks or climbing stairs, occasional vomiting, mild soreness and stiffness in his hands, and moderate back pain radiating to his groin. This time, he said he was treated for carpal tunnel syndrome four years earlier. (R. 192). The only medication he was taking was Ibuprofen. He weighed 137 pounds. (R. 192). Range of motion in the spine was limited to 50/90 degrees flexion. Neurological exam was normal, as was manipulation and grip strength. Mr. Lomax had some difficulty walking on his heels and toes, squatting and rising, and getting off and on the exam table. His gait was normal. He used a cane when needed to bear weight and for confidence but, at the exam, he was able to walk fifty feet normally. (R. 193).

X-ray of the lumbar spine in June 2005 showed that disc spaces were adequately maintained, with no malalignment or compression deformity. There was no evidence of spondylolisthesis or spondylolysis. There were, however, some small degenerative spurs. (R. 198).

4

In September 2005, Mr. Lomax sought treatment for back pain radiating down his thigh; he rated its severity as a 10/10. Straight leg raising was positive bilaterally. (R. 224). There was limited range of motion in the lumbar spine and muscle spasm. (R. 228). Diagnosis was myofascial pain. (R. 228). He continued to seek treatment with repeated trips to the Stroger Hospital into 2007. (R. 227-39). Few of these entries are legible. In April of 2007, Mr. Lomax reported 10/10 back pain. He said he had stopped drinking days earlier. He used a cane to walk, but had no trouble with stairs, and heel/toe walked normally. Motor and sensation exam appear to have been normal. (R. 282).

A lumbar spine CT scan in October 2005 revealed mild calcification of the posterior longitudinal ligament, but no significant disc bulge or joint disease, no stenosis, and no evidence of any neural impingement. (R. 222).

In March of 2006, Mr. Lomax sought treatment at the Stroger Cook County Hospital pain clinic for lower back pain radiating down his legs. Straight leg raising was negative bilaterally, and there was no motor or sensory deficit. (R. 268). In April of 2006, Mr. Lomax had a steroidal injection in his sacroilliac joint. He had been experiencing spasm and tenderness. Once again, he exhibited no motor or sensory deficit; results of straight leg raising are illegible. (R. 269). Subsequent checkups in June and October yielded similar results: spasm, but negative straight leg raising and normal motor and sensory exam. (R. 229-30). Throughout this period, Mr. Lomax was advised at each of his visits to undertake both physical and occupational therapy. (R. 229, 232, 259, 269).

Mr. Lomax had a CT scan of his cervical spine in April of 2007. There was no evidence of fracture or bony lesions, but there was some rotary subluxation at C1-2 which might have reflected

muscle spasm. There was also a straightening of the spine and mild retrolisthesis at C4-C7. (R. 277).

**C.**
**Administrative Hearing Testimony**

**1.**
**Plaintiff's Testimony**

Mr. Lomax testified that he is unable to work now because he cannot stand or sit for very long without getting tired. (R. 310). He also has carpal tunnel, which Mr. Lomax claimed forced him to switch jobs in 2003. (R. 303). He said he incurred the condition on the job, but never made a workers' compensation claim. (R. 304). Mr. Lomax testified that he has pain in his hips, back, and down his legs and all around the groin. (R. 317, 327). For the past year, he has had pain in his upper back. (R. 327). He says he can't sit down too long because of the pain and he has to stand up, however, he also can't stand up for very long because the pain comes back and he has to sit down. (R. 325).

Mr. Lomax claimed that his pain prevents him from performing ordinary, daily tasks such as picking things up, writing, putting on his socks, and tying his shoes. (R. 310). He can't sit in a bathtub and he can't sit on the commode too long because his hips will hurt and he has to get up. (R. 338). Mr. Lomax said that he is able to shave and button his shirt, but putting on his pants takes awhile and it takes about fifteen minutes to put on socks because he has to stop and rest after he puts on the first sock. (R. 337). He testified that he can lift about five pounds, including five pounds of chicken wings or a gallon of milk. (R. 335). He can't lift a case of pop because he would feel numbness in his hands and the back of his neck would start hurting. (R. 336). He doesn't drive – he has no license – and claims he can't take the El because the shaking of the El hurts his hips. (R.

336). But he apparently does not have the same trouble on city buses. (R. 336).

Mr. Lomax testified that he spends his days sitting around, watching tv, and listening to music. (R. 334). He can't cut the grass because his hips and hands hurt when he tries. (R. 334). He can't vacuum because the vibrating makes his hands numb. (R. 334). He claimed he can only walk a block or two, but not because of pain -- because he gets out of breath. (R. 334, 337). He can't sit down long enough to play cards and his hands stay numb so he can't shoot pool and he can't drive because his legs stay stiff. (R. 335). According to Mr. Lomax, every day his feet feel numb, sometimes the right foot, but mostly the left. (R. 330).

Mr. Lomax has just started taking a medication for that numbness, so it has not made a difference yet. (R. 330). Mr. Lomax testified that he takes medication for his stomach and for pain and arthritis. (R. 319). He goes to the pain clinic for tests, and claimed he has never been referred for physical therapy. (R. 317, 321). Mr. Lomax testified that upon waking up he takes medicine and tries to move around. (R. 334). He tries to exercise a little, including lifting his legs to help the pain in his legs and back, but it doesn't help (R. 327, 329). But he has not gone to back pain management class or physical therapy. (R. 329).

Mr. Lomax said he has been using a cane since his hernia surgery. (R. 339). He said he has worked since he started using the cane, but never used the cane at work. (R. 339). He said ne does not go anywhere without it. (R. 339). He did not get the cane from a doctor or have it prescribed or recommend, though. (R. 339). He found it on the street and he says his doctor told him he should keep it. (R. 340).

He has slowed down on taking his medicine the last few years because he kept throwing up. (R. 321). But he testified that it is not really the medicine bothering his stomach, it is anything that

he puts into his stomach. (R. 321). Mr. Lomax said if he lies down after eating he just throws up and it hurts his stomach. (R. 323). He allowed that he hasn't vomited in awhile. (R. 323). He said he is losing weight constantly – he said he used to weigh 170 pounds and now weighs 135 pounds. (R. 324).[2]

Mr. Lomax testified that he does not have a drinking problem and was never a really heavy drinker. (R. 331-332). He admitted that doctors told him they thought he should cut down on his drinking. (R. 332). He has had two DUIs – in the late 90s – but testified that he stopped drinking hard liquor close to a year ago. His last drink was roughly a month before the hearing when he had five beers on his birthday. (R. 299, 331-333). Prior to his birthday, Mr. Lomax said that his last drink was probably around New Year's. (R. 331).

Mr. Lomax said that he last worked as a security guard at a retail clothing store. (R. 300-01). He basically would take customers' bags as they came in, and return them as they left. (R. 301). He kept an eye on people, as well, making sure they didn't steal. (R. 301). The job involved both standing and sitting. (R. 342). He worked there for about six months, from December of 2003, through May of 2004. (R. 301). At that point, business became slow, and he was laid off along with other staff members. (R. 302). He applied for and received unemployment insurance for the ensuing six months, and sought a job as a janitor but had no offers. (R. 301).

---

[2] The medical evidence does not document anything like a "constant[]" loss of weight. The first mention of Mr. Lomax's weight in the medical record was in January 2004, when he weighed 130 pounds. (R. 156). He weighed 133 pounds a month later (R. 172), but 128 by April 2004. (R. 216). He was back up to 130 in September 2004. (R. 150). In May 2005, his weight was 138 (R. 210), in July 2005: 137. (R. 192). By September 2005, he was up to 141. (R. 225). In March 2006, Mr. Lomax weighed 138. (R. 268). In May of 2005, it was 137. (R. 238). The ALJ did not make this a part of her determination, but it certainly seems to call into question the veracity of Mr. Lomax's complaint's about his digestive problems.

8

## 2.
## The Vocational Expert's Testimony

Cheryl Hoiseth then testified as a vocational expert ("VE"). She said that Mr. Lomax's past work as a security guard was light and unskilled. (R. 345). She said the Dictionary of Occupational Titles listed general security guard work as light and at the low end of semi-skilled, which translated to unskilled under the Commissioner's regulations, with an SVP of just 3. (R. 345). Much of his previous work was medium. (R. 345-46). The ALJ asked Ms. Hoiseth to consider a hypothetical individual who was a fifty-year-old male with a high school education, and who was limited to light work that did not involve climbing ladders, ropes, or scaffolds, working on uneven surfaces or unprotected heights or around hazardous equipment. (R. 628). Ms. Hoiseth indicated that such a person could perform Mr. Lomax's past work as a security guard. (R. 347). It would not matter if such a person could only occasionally stoop, kneel, crouch, or crawl. (R. 347). Assuming an additional limitation to sedentary work, Ms. Hoiseth testified such a person could perform work as a receptionist, general office clerk, packager, or assembler. (R. 347). None of these jobs would permit a person to change from a standing to a sitting position as often as every fifteen minutes, though; the minimum would be about forty-five. (R. 348). Ms. Hoiseth testified that while security jobs in general would not allow a person to use a cane when walking farther than fifty feet, the security job Mr. Lomax described probably would. (R. 349). Other light jobs would as well, such as clerks, but not light manufacturing jobs like assemblers or packagers. (R. 349-50). When questioned by Mr. Lomax's counsel, Ms. Hoiseth testified that if all of Mr. Lomax's allegation were accepted, there would be no work he could perform. (R. 351).

# D.
## The ALJ's Decision

The ALJ found that Mr. Lomax suffered from gastroesophageal reflux disease, gastritis, and low back pain. (R. 16). These were severe impairments as defined by the regulations. (R. 14, 16). The ALJ further found that Mr. Lomax's impairments did not meet the criteria of the Listing of Impairments, specifically the listings for digestive and spinal impairments. (R. 16-17). The ALJ speculated that Mr. Lomax's past heavy alcohol use likely contributed to his gastroesophageal problems, but that he had moderated or ceased his use, and it did not rise to the level of a listed impairment. (R. 17).

The ALJ found that Mr. Lomax was capable of performing a wide range of light work: lifting or carrying 20 pounds occasionally or 10 pounds frequently, and sitting, standing or walking throughout a workday. (R. 17). But Mr. Lomax would be unable to do work involving climbing ropes or scaffolds, and could only occasionally climb ramps or stairs, or stoop, kneel, crouch, or crawl. (R. 17). In support of these findings, the ALJ set forth a lengthy and thorough review of the medical evidence. (R. 17-24).

The ALJ recounted Mr. Lomax's testimony regarding his pain and limitations. She found his statements concerning the intensity, persistence, and limiting effects of his symptoms not entirely credible, especially in light of the objective medical evidence and conservative course of treatment. (R. 27-28). The ALJ then reviewed the VE's testimony. She determined that Mr. Lomax would be able to perform his past work in retail security but, even f he could not, there were a significant number of jobs in the national economy that he could perform. (R. 29). Accordingly, she found Mr. Lomax not disabled. (Tr. 29-30).

# IV.
## DISCUSSION

### A.
### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Berger*, 516 F.3d at 544; *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Binion*, 108 F.3d at 782. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for her decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176; *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence

11

that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7ᵗʰ Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595. In other words, as with any well-reasoned decision, the ALJ must rest a denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Berger*, 516 F.3d at 544; *Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7ᵗʰ Cir. 2008).

**B.**
**Five-Step Sequential Analysis**

Section 423(d)(1) defines "disability" as an: "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Heckler v. Day*, 467 U.S. 104, 107 n.1 (1984); *Skinner v. Astrue*, 478 F.3d 836, 844 (7ᵗʰ Cir. 2007). The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff is unable to perform any other work in the national economy.

20 C.F.R. §§ 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7ᵗʰ Cir. 2005); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7ᵗʰ Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. §416.920; *Briscoe*, 425

F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1989). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. §404.1520; *Stein,* 892 F.2d at 44. The plaintiff bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe,* 425 F.3d at 352.

## C.
## Analysis

Mr. Lomax argues that the ALJ's decision must be overturned for three reasons. First, he contends that the ALJ ignored medical evidence that was favorable to his claim. Second, he argues that the ALJ failed to adequately assess the credibility of Mr. Lomax's symptoms, especially in view of the medical record. Third, he says the ALJ improperly rejected the VE's testimony that Mr. Lomax could not perform any work because he has to use a cane. But, upon consideration, these arguments are not well-taken, and the ALJ's decision is supported by substantial evidence and must be affirmed.

## 1.
## The ALJ Considered All The Relevant Evidence

While an ALJ need not discuss every piece of evidence in the record, *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009), he cannot ignore evidence that conflicts with his conclusion. *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 354 (7th Cir. 2005). This is a principle of long standing. *See e.g., Herron,* 19 F.3d at 333-334. Indeed, it was in the context of reiterating this principle that Judge Posner's panel opinion in *Sarchet v. Chater,* 78 F.3d 305 (7th Cir. 1996) coined the phrase "accurate and logical bridge" to describe the requirement that an ALJ must explain the basis for his conclusion – and that conclusion must be logical – or it will not be sustained, even if there is enough record evidence, when considered in isolation, to support the decision:

We cannot say that this combination of belief and disbelief would be unreasonable but we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result. *Green v. Shalala,* 51 F.3d 96, 100-01 (7th Cir.1995); *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir.1994); *Zblewski v. Schweiker,* 732 F.2d 75, 78-79 (7th Cir.1984); *Cline v. Sullivan,* 939 F.2d 560, 563-69 (8th Cir.1991).

*Sarchet,* 78 F.3d at 307.

Felicitous phrases can be dangerous.[3] Since, as Judge Posner, himself, has cautioned, "[j]udges expect their pronunciamentos to be read in context," *Wisehart v. Davis,* 408 F.3d 321, 326 (7th Cir. 2005); *see also Aurora Loan Services, Inc. v. Craddieth,* (7th Cir. 2006), it is appropriate to review the cases on which Judge Posner's opinion relied to understand what was meant by the "logical bridge" phraseology.[4] In *Zblewski, supra,* the court, with Judge Posner on the Panel, emphasized the impermissibility of an ALJ's failure to explain why testimony contrary to the ALJ's conclusions was rejected. That failure, the court said, made meaningful appellate review under the "substantial evidence" standard, impossible:

> While there may be strong grounds upon which the ALJ rejected claimant's evidence in this case, as the district judge presumed, we cannot say on the basis of the record

---

[3] What Justice Frankfurter said in *Tiller v. Atlantic Coast Line R. Co.,* 318 U.S. 54, 68 (1943)(Frankfurter, J., concurring) can well be applied to the often-indiscriminate reliance on the "logical bridge" language: "A phrase begins life as a literary expression; its felicity leads to its lazy repetition; and repetition soon establishes it as a legal formula indiscriminately used to express different and sometimes contradictory ideas." *See also* Holmes, *Law and Science, Science and Law,* 12 Harv.L.Rev. 443, 455 (1899) ("It is not the first use but the tiresome repetition of inadequate catch words upon which I am observing – phrases which originally were contributions, but which, by their very felicity, delay further analysis for fifty years. That comes from the same source as dislike of novelty, – intellectual indolence or weakness – a slackening in the eternal pursuit of the more exact.").

[4] The concept that the "force" of administrate determinations depends heavily on the validity of the reasoning in the "logical bridge" between statute and regulation was recognized by the D.C. Circuit in *Thompson v. Clifford,* 408 F.2d 154, 167 (D.C. Cir.1968).

that such a conclusion is self-evident. *In the absence of an explicit and reasoned rejection of an entire line of evidence, the remaining evidence is "substantial" only when considered in isolation.* It is more than merely "helpful" for the ALJ to articulate reasons ( *e.g.,* lack of credibility) for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review. As the Third Circuit put it in *Cotter v. Harris,* 642 F.2d 700, 705 (3d Cir.1981), when the ALJ fails to mention *rejected evidence,* "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored."

This court is not unmindful of the heavy and unique burden placed upon ALJs in Social Security Act cases. We emphasize that we do not require a written evaluation of every piece of testimony and evidence submitted. *However, a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position.*

732 F.2d at 78 -79 (emphasis supplied).[5]

In *Herron,* the court, with Judge Posner again on the panel, said:

> Our cases consistently recognize that meaningful appellate review *requires the ALJ to articulate reasons for accepting or rejecting entire lines of evidence.* Although a written evaluation of each piece of evidence or testimony is not required, neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion. We have repeatedly stated that the ALJ's decision must be based upon consideration of all the relevant evidence, *and that the ALJ "must articulate at some minimal level his analysis of the evidence."*

19 F.3d at 333-334 (emphasis supplied)(citations omitted).

*Green v. Shalala,* was the then most recent of the cases on which *Sarchet* relied. Like its

predecessors, it articulated the requirement that an ALJ must explain the reasons for his decision:

> However, we have often addressed, in the context of Social Security disability cases, the type of evidence an ALJ must weigh in his decision *and the extent to which the ALJ must state the reasons for his conclusions to permit an informed review.* A written evaluation of each piece of evidence or testimony is not required. *However, in cases where the claimant presents considerable proof to counter the agency's*

---

[5] *Cline v. Sullivan,* cited by Judge Posner in *Sarchet,* held that the ALJ must make an express credibility determination detailing his reasons for disbelieving appellant's allegations of pain. 939 F.2d at 565.

*position, the ALJ must articulate, at some minimal level, his analysis of the evidence.*
Only then may a reviewing court track the ALJ's reasoning and be assured that the
ALJ considered the important evidence. Accordingly, we have held that the ALJ's
failure to discuss an entire line of evidence does not meet the minimal level of
articulation required.

51 F.3d at 101 (emphasis supplied)(citations omitted).

Notably absent from the list of supporting authority in *Sarchet* is Judge Easterbrook's opinion

for a divided panel in *Stephens v. Heckler*, 766 F.2d 284, 290 (7th Cir. 1985). While that opinion

required, in words, that the ALJ provide "'a minimal level of articulation as to his assessment of the

evidence . . . in cases where considerable evidence is presented by the claimant to counter the

agency's position,'"(quoting *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985), in substance, it

allowed a reviewing court to sustain an ALJ's decision, the basis of which the ALJ had left

unexplained. The majority opinion stressed that under the statute, ALJs were not required to fully

explain their reasoning. *Stephens*, 766 F.2d at 288. And, like the earlier opinion in *Zblewski*,

*Stephens* underscored the difficulties under which ALJs were required to perform their tasks:

We do not have the fetish about findings that [the plaintiff] attributes to us. The court
reviews judgments, not opinions. The statute requires us to review the quality of the
evidence, which must be "substantial," not the quality of the ALJ's literary skills. The
ALJs work under great burdens. Their supervisors urge them to work quickly. When
they slow down to write better opinions, that holds up the queue and prevents
deserving people from receiving benefits. . . . When they process cases quickly, they
necessarily take less time on opinions. When a court remands a case with an order
to write a better opinion, it clogs the queue in two ways-first because the new hearing
on remand takes time, second because it sends the signal that ALJs should write more
in each case (and thus hear fewer cases).

766 F.2d at 287.

In *Stephens*, the court "d[id] not insist on completeness in the ALJ's reasoning." It was

enough that the "ALJ acknowledge potentially dispositive evidence." 766 F. 2d at 288. In *Stephens*,

the ALJ set out all the pertinent medical reports, which ranged from strongly supporting the

plaintiff's claim to completely undermining it; he did not, however, address the plaintiff's complaints of pain. *Id.* at 287-88. Nonetheless, *Stephens* affirmed because in finding that the plaintiff could not do his old job, but could do sedentary work, it was "apparent" that the ALJ credited certain complaints and discredited others. *Id.* at 288. There was a "logical path to a conclusion supported by substantial evidence," even if "the ALJ did not articulate it in so many words . . . ." *Id.* As Judge Easterbrook put it, "[a] more extensive requirement sacrifices on the altar of perfectionism the claims of other people stuck in the queue." *Id.*

Judge Flaum concurred in the result, but wrote separately to underscore what he perceived to be the "marked, unnecessary, and unfortunate departure from the precedent established by this circuit in *Zblewski v. Schweiker,* 732 F.2d 75 (7th Cir.1984)" that the majority opinion represented:

> The majority's attempt to minimize this circuit's established standard would perhaps be understandable, though still not appropriate, if the ALJ's opinion below failed to meet that standard. But that is not the case here. I therefore write separately to underscore that the ALJ in this case clearly met the existing standards that this circuit has heretofore established for the proper evaluation of Social Security disability cases, and to express disagreement with the majority's unduly restrictive view of the roles of the ALJs and the courts in adjudicating disability claims.

766 F.2d at 289.

Judge Flaum went on to explain that the requirement that an ALJ articulate at some minimal level his assessment of the evidence in cases where considerable evidence is presented by the claimant to counter the agency's position enables a reviewing court to determine "whether the ALJ considered and assessed the relevant evidence, a determination which is essential if we are to perform our statutorily-mandated review function." 766 F.2d at 290. The requirement that the ALJ must minimally articulate his reasoning has never, Judge Flaum explained, "been interpreted to require literary perfection in an ALJ's opinion, nor is it so unduly burdensome as to hinder the ALJ's

resolution of disability claims." *Id.* Fidelity to Congress' charge to the courts that they must conduct careful disability determinations requires that judges "must be able to determine whether the ALJ considered and evaluated the relevant evidence," *id.* and that in turn "requires us to demand more than sketchiness on the part of the ALJ." *Id.* at 292. Judge Flaum concluded his emphatic opinion by "disassociat[ing]" himself from the majority opinion to the extent that it "implies that this court will not bring to its task of review the same oversight that we have exercised in our prior decisions in disability cases...." *Id.* at 293.

Seven months after *Stephens* was decided, the court in *Tom v. Heckler,* 779 F.2d 1250, 1257 (7th Cir.1985), again with Judge Posner on the panel, tacitly rejected that portion of the *Stephens* majority opinion that prompted Judge Flaum's concurrence and pointedly cited his concurring opinion as properly expressing the standard that this circuit requires to ensure meaningful appellate review:

> This court requires of the ALJ a "minimal level of articulation" of his assessment of the evidence to show that he considered that which the law requires him to consider. *Stephens v. Heckler,* 766 F.2d 284, 287-88 (7th Cir.1985); *Zalewski v. Heckler,* 760 F.2d 160, 166 (7th Cir.1985); *Zblewski v. Schweiker,* 732 F.2d at 78. *See also Johnson v. Heckler,* 769 F.2d at 1212-13. Here, the record discloses that the ALJ gave no consideration to the issue of "highly marketable" skills. The words "highly marketable" are not used, nor is the relevant regulation cited. Indeed, the ALJ did not even include in his decision the approximate number and locations of the four jobs which the vocational expert identified as existing in the Fort Wayne area (facts which the Secretary, at oral argument, urges that we accept as adequate to support an implicit finding that Tom possesses skills which are highly marketable).

> Consequently, we conclude that the ALJ failed to meet the threshold standard that this circuit requires to ensure meaningful appellate review. *See Stephens v. Heckler,* 766 F.2d at 291 (Flaum, J., concurring).[6]

_____

[6] While there is seemingly no meaningful semantic difference between Judge Easterbrook's "logical path" language in *Stephens* and Judge Posner's "logical bridge" formulation a decade later in *Sarchet v. Chater,* the two cases dictate different modes of review. For Judge Easterbrook, it was enough for the

(continued...)

In 1987, Judge Shadur expressed the view that *Stephens* did not represent the law of this Circuit. *See Banks v. Bowen,* 672 F.Supp. 310, 320 (N.D.Ill. 1987). That conclusion was confirmed by subsequent cases, which cited *Stephens* either for propositions about which there was no dispute, such as the weight to be given treating physician's testimony, *Micus v. Bowen* 979 F.2d 602, 607 (7Th Cir.1992), or for the proposition that the ALJ must provide a minimal level of articulation as to his assessment of the evidence in cases where considerable evidence is presented by the claimant to counter the agency's position. *See e.g., Stein v. Sullivan,* 966 F.2d 317 (7th Cir. 1992); *Nelson v. Apfel,* 131 F.3d 1228 (7th Cir. 1997). Interestingly, the qualification that the minimal level of articulation must occur "in cases in which considerable evidence is presented to counter the agency's position," seems not to have appeared in any Seventh Circuit case after *Nelson.* In all subsequent cases, there is no qualifier, and the ALJ must explain his or her analysis regardless of whether the contrary evidence is considerable or not.

Today, consistent Seventh Circuit precedent makes clear that ALJs must articulate at some minimal level the basis on which they reached their decisions. The "logical bridge" requirement does not specify how much the ALJ must say – the very nature of the enterprise precludes quantification, and the staggering workload of ALJs dictates that their opinions are, of necessity, often succinct. www.ssa.gov/policy/docs/statcomps/supplement/2008/2f8-2f11.html. Rather, it

---

[6](...continued)
*reviewing court* to be able to find a logical path to the conclusion so long as there was evidence in the record without regard to whether the ALJ's opinion showed that he took that path. *See* 766 F.2d at 288. *Sarchet,* requires *the ALJ* to build the "bridge" from the evidence to the result and for the reviewing court to determine whether it was structurally sound. In Judge Easterbrook's view, "[a] more extensive requirement sacrifices on the altar of perfectionism the claims of other people stuck in the queue." 766 F.2d at 288. In the view of *Sarchet* and its predecessors and successors, requiring the ALJ to build the bridge rather than requiring the reviewing court to find a possible path was necessitated by Congress' allocation of responsibilities under the statute.

merely recognizes the obligation of the ALJ ""to rationally articulate the grounds for... decision,'"

*Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). "[A]s with any well-reasoned decision, the

ALJ must rest... denial of benefits on adequate evidence contained in the record and must explain

why contrary evidence does not persuade." *Berger v. Astrue,* 516 F.3d 539, 544 (7th Cir. 2008). That

is a "lax standard." *Id.  Accord Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Stein,* 966 F.2d

at 320. [7]

The ALJ in this case has more than complied with his obligation to build an accurate and

logical bridge from the evidence to the result.  The ALJ's review of the medical record was

exceedingly thorough, covering seven single-spaced pages. (R. 17-24).  Although the law does not

require her to, she may well have mentioned every relevant piece of evidence in the record.  By

contrast, the review of the medical record in Mr. Lomax's brief is just a scant two double-spaced

pages. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment*, at 2-3).  Beyond that,

the argument is simply wrong – the ALJ did not even ignore the few bits of evidence Mr. Lomax

claims she did.

Much of Mr. Lomax's argument that the ALJ failed to comply with the accurate and logical

bridge requirement is based on a misreading of the record.  He contends that the ALJ failed to

consider his carpal tunnel syndrome as a "severe" impairment, contrary to the medical evidence.  But

the evidence he points to is not supportive of the claim.  For example, he says: "Dr. M.S. Patel's [sic]

---

[7] For example, the "logical bridge" requirement mandates that an ALJ specifically discuss medical reports  and to explain how much weight each was accorded and why that allocation was made. *See Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008).  An ALJ cannot fail to address a plaintiff's complaints, with a credibility determination being implicit in the conclusion. *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003).  Furthermore, an ALJ must specifically point out which medical reports were inconsistent with a plaintiff's complaints, *Ribaudo v. Barnhart*, 458 F.3d 580, 584 -85 (7th Cir. 2006); *Sarchet*, 78 F.3d at 307, and explain why they were preferred. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir.  2000).

diagnostic impression includes carpal tunnel syndrome." (*Memorandum in Support of Plaintiff's Motion for Summary Judgment*, at 5). But Dr. Patil said nothing of the kind – quite the contrary. He stated that his neurological exam in terms of possible carpal tunnel syndrome was normal bilaterally. (R. 194). Moreover, Mr. Lomax's dexterity was fine upon testing. He had no difficulty, with either hand: opening a door knob, squeezing a B.P. cuff, picking up a cup, picking up a coin, picking up a pen, buttoning a shirt, pulling a zipper, tying shoelaces, writing his name, turning a page. And his grip strength was normal – 5/5 bilaterally. (R. 193). The report undermines any claim Mr. Lomax might make that his carpal tunnel syndrome is a severe impairment.[8] What is more, the ALJ clearly did not ignore this report. (R. 21), and the only other physician who examined Mr. Lomax with his complaints of carpal tunnel syndrome in mind indicated that his "clinical examination was almost unremarkable." (R.158).

Mr. Lomax also claims the ALJ ignored other evidence regarding upper extremity pain due to carpal tunnel syndrome from April 10, 2007, and May 18, 2007. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment*, at 5). One is the result of a CT scan of Mr. Lomax's cervical spine – his neck – and the other references it. (R. 263, 277). Results revealed a mild impairment. There might be pain radiating from the neck to the arm – Spurling's test was positive

---

[8] An impairment is severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c); *Nelson v. Apfel*, 210 F.3d 799, 802 (7th Cir. 2000). Basic work activities include, among other things: walking, standing, sitting, lifting, pushing, reaching, carrying, handling; understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). An impairment is not severe if the "medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered . . . ." Social Security Ruling ("SSR") 85-28, 1985 WL 56856, *3; *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987).

on the left (Mr. Lomax is right-handed)– but that would have nothing to do with carpal tunnel syndrome, which is the compression of a nerve in the wrist. And again, and more importantly, the ALJ didn't ignore the evidence; she clearly considered it. (R. 23).

Mr. Lomax also finds fault with the manner in which the ALJ addressed the fact that he uses a cane. The ALJ explained:

> [Mr. Lomax's counsel] asked [Mr. Lomax] about the cane he brought to the hearing and [Mr. Lomax] testified that, shortly after his hernia surgery, he found the cane on the street and started to use it, as it was lightweight and in good condition. He testified that he does not go anywhere without the cane. While [Mr. Lomax] brought the cane to the July, 2005 consultative exam, . . . , the examining doctor also noted that [Mr. Lomax's] gait was normal, and that [Mr. Lomax] reported that he used the cane "as needed to bear weight and for confidence." [Mr. Lomax] was observed to walk 50 feet without the cane at the exam.

(R. 28).

That consultative exam provides the only discussion of the cane anywhere in the medical record. Elsewhere, if mentioned at all, nothing is made of it. There is no record of a doctor prescribing or recommending one; all Mr. Lomax says is that his doctor told him to keep it. (R. 339-40). But the ALJ certainly did not ignore the matter of the cane, and based on the record, she was certainly not out of line in dismissing it as evidence that Mr. Lomax couldn't work. *See Binion v. Shalala*, 13 F.3d 243, 248 (7th Cir. 1994)(in assessing credibility, ALJ could consider fact that no doctor prescribed use of cane and plaintiff used it for reassurance).

Yet, even though there is no record of a doctor prescribing a cane for Mr. Lomax, he claims that there is objective medical to support the fact that he requires a cane, and again contends the ALJ ignored it. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment*, at 5). He lists the evidence as an: October 2005 lumbar spine CT scan showing mild calcification of the posterior

longitudinal ligament; evidence of low back pain and radiculopathy; and a June 2005 x-ray showing degenerative spondylolysis. The ALJ did not ignore the first (R. 22), which was essentially normal with the exception of some mild calcification. (R. 222). The second is not necessarily independent, objective evidence, but a recounting of Mr. Lomax's complaints by a physician. (R. 223-227). The report does include a positive straight leg raising test – which can be indicative of radiculopathy – but it is one test and one report in a record that includes many negative tests. (R. 158, 268, 229-30). And the reviewing court may not decide to attribute more weight to it than the others; weighing the evidence is the ALJ's job. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Also, not surprisingly given the ALJ's attention to the other evidence, the ALJ certainly did not ignore it. (R. 21-22). As for the third, Mr. Lomax misreads the x-ray result. It read, in fact, "normal facet articulation *without* evidence of spondylolisthesis or spondylolysis." (R. 198) (emphasis supplied)).

## 2.
### The ALJ Properly Assessed The Credibility Of Mr. Lomax's Allegations

Mr. Lomax also calls into question the ALJ's credibility assessment – an argument disability claimants invariably make. It ought not to be so commonplace, as caselaw only allows for overturning an ALJ's credibility determination on rare occasions. The reviewing court must defer to the ALJ's credibility finding unless it is "patently wrong." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir.2006). As long as there is some support for it in the record, it will stand. *Berger*, 516 F.3d at 546; *Schmidt*, 496 F.3d at 842. In this case, there is more than "some support" for the ALJ's credibility assessment.

An ALJ may not ignore a claimant's subjective reports of pain simply because they are not supported by objective medical evidence, but discrepancies between objective evidence and a

claimant's complaints may suggest that the claimant is exaggerating his limitations. *Getch*, 539 F.3d at 473; *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir.2005). It is perfectly acceptable for an ALJ to assess whether a claimant's testimony is consistent with the medical evidence in terms of the level of pain the claimant is alleging. *Schmidt*, 496 F.3d at 844. Thus, where the record reveals medical findings such as normal neurological findings, strength, reflexes, and sensation, an ALJ is well within her rights to find a clamant's allegations not entirely credible. *Id.* And that's what the ALJ did here.

The ALJ felt the objective medical evidence was not consistent with the severity of Mr. Lomax's allegations. Much of the evidence regarding his lumbar problems, including x-rays and CTs, was benign, or characterized as mild. The same may be said for the cervical spine – that CT also revealed only mild abnormalities. While he received steroid injections, he never complied with doctor referrals for physical and occupational therapy – another valid consideration, in addition to the objective findings. *Schmidt*, 496 F.3d at 843 (ALJ propoerly considered claimant's failure to pursue physical therapy). His hernia had been repaired. His gastrointestinal problems had improved with treatment and medication, and his curbing of his alcohol use. There was nothing in the medical record to indicate he had any limitations do to his alleged carpal tunnel syndrome. Examinations revealed he had no problems with his dexterity or grip strength or sensation.

Mr. Lomax disagrees, arguing that the ALJ "omi[tted] relevant medical evidence" in her consideration of his symptoms. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment*, at 7). The evidence he refers to, however, does nothing to support his contention. He says he testified "that he is very tired, experiences pain in his hands, stomach, hips, and back. His back pain radiates down his right leg. . . . he had no lasting benefit from any of the treatment or

injections and minimal benefits from prescribed medication." (*Id.*). While those are his complaints in and of themselves, they do nothing to bolster his credibility. Mr. Lomax also points to "Dr. Patil's diagnostic impressions . . . degenerative arthritis, history of carpal tunnel syndrome, and degenerative spondylolysis." (*Id.*). But diagnoses alone mean little in terms of limitations; having an impairment is not the end of the quest for benefits – the impairment must be disabling. *See, e.g., Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005); *Sarchet*, 78 F.3d at 307. A "history" of an impairment says nothing about its disabling effects, or if it has any at all. Moreover, here the "history" came from Mr. Lomax – not medical records – so it is no different than subjective testimony. That's where the objective medical evidence comes in – the evidence the ALJ considered in assessing Mr. Lomax's allegations. That evidence was mild in terms of arthritis, and non-existent in terms of carpal tunnel syndrome. And, as already noted, the x-ray Mr. Lomax again refers to was "*without evidence of . . . spondylolysis.*" As such, the ALJ did not miss anything, provided a valid rationale for her finding, and her credibility assessment must stand.

## 3.
## The ALJ's Determination That Mr. Lomax Can Perform His Past Work As A Security Guard Is Supported By Substantial Evidence

In his reply brief, Mr. Lomax has added an additional complaint about the ALJ's decision that was not advanced in his opening brief. He contends the ALJ failed to fully develop the record with regard to the walking demands of his past work and ignored the VE's testimony that Mr. Lomax's need to use a cane to walk would render him unable to perform light work. (*Plaintiff's Reply Memorandum*, at 3-4). However, as the Seventh Circuit has repeatedly admonished, reply briefs are for replying, not for raising new matters or arguments that could have been – and ought

to have been – advanced in the opening brief. *See United States v. Boyle*, 484 F.3d 943, 946 (7th Cir.2007)(arguments are forfeited); *United States v. Alhalabi*, 443 F.3d 605, 611 (7th Cir.2006); *Carter v. Tennant Co.*, 383 F.3d 673, 679 (7th Cir.2004); *Autotech Technologies Ltd. Partnership v. Automationdirect.com, Inc.*, 235 F.R.D. 435, 437 (N.D.Ill. 2006).

Even if this misstep and the resulting forfeiture of the argument are ignored, the ALJ did not neglect the requirements of Mr. Lomax's security work. In her opinion, she reiterated his description of the job:

> [H]is primary duty was to take and hold packages carried into the store by shoppers at the front door of the store, and to return the bags when the customers were ready to leave. He testified that the work was difficult because he had to keep track of a large number of bags and that it was difficult for him to bend over and pick up things off the floor as needed. He nevertheless continued to work at that job until around Mother's Day in 2004, when he was laid off along with other employees, due to lack of work. . . . he subsequently received unemployment compensation for about six months.[9]

(R. 29). He also testified that he was on his feet when the store was crowded, but sat down when it wasn't. (R. 342). The VE characterized the work as light – meaning it required lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. A job may also be considered light work if it requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday, with intermittent sitting. 20 C.F.R. §404.1567(b); *Haynes v. Barnhart*, 416 F.3d 621, 627 n.1 (7th Cir. 2005)(citing Social Security Ruling ("SSR") 83-

---

[9] While the ALJ does not belabor the point, he hardly needed to have done so since it is well known that application for and collection of unemployment compensation requires ready-to-work certification. *See Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005). Mr. Lomax alleges he became disabled in April or 2004 – which would be shortly before he was laid off. Moreover, if he collected unemployment for six months after that, it meant he was certifying he was ready and able to work until at least mid-September of 2004, well after he claims to have been disabled. This, too, is a valid consideration in determining whether a claimant's allegations are credible. *Schmidt, supra.*

10, 1983 WL 31251, at *5-6). That's a fair amount of information about the demands of Mr. Lomax's past work, belying any contention that the record was undeveloped on this point.

Mr. Lomax seems more concerned with the fact that his use of a cane did not enter into the ALJ's assessment of his residual functional capacity – especially since the VE testified that an individual requiring a cane to walk could not perform certain light work or security jobs as they are generally performed. He does not acknowledge that the VE testified that an individual with a cane could probably perform the security job Mr. Lomax described. But the ALJ did not rely on that piece of evidence, nor did she have to find Mr. Lomax could perform his past work.[10]

The ALJ was not forced to adopt that portion of the VE's testimony crediting Mr. Lomax's claim that he must use a cane. An ALJ's hypothetical to a VE need only include those limitations supported by the medical evidence. *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009). Obviously, an ALJ is not constrained to include limitations she has found not credible in her hypothetical or residual functional capacity determination. *Schmidt*, 496 F.3d at 846. She doesn't have to include canes found on the street, crutches fished out of dumpsters, or eye patches picked up in costume shops. It doesn't matter if a doctor says, "you may as well hang on to that." What matters is whether a doctor says, "you must use that," and none did here. Mr. Lomax may disagree with the ALJ's RFC assessment insofar as it failed to include cane use, but that is not a reason to overturn her thorough and well-reasoned decision. *Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002).

---

[10] According to Mr. Lomax's testimony, he did not feel it necessary to use his cane at his security job at the retail store, although he already had it when he worked there. (R. 339). But this is not entirely clear because he said he found it after his hernia surgery, which was apparently in 2005, and he was laid off of work in mid-2004. (R. 210-212, 339). Perhaps the confusion is why the ALJ did not rely on this piece of evidence either. But it certainly tends to undermine Mr. Lomax's argument in this regard.

## CONCLUSION

While an ALJ's decision cannot be "cursory," *Luster v. Astrue,* 2010 WL 21194, 2 (7th Cir. 2010), or "sketchy," *Stephens,* 766 F.2d at 291, the requirement that the ALJ build an "accurate and logical bridge" between the evidence and the result does not require that the ALJ do more than minimally articulate the reasons that underlay the conclusions. The "logical bridge" requirement does not demand that every piece of evidence or testimony be evaluated in writing. *Green,* 51 F.3d at 101. Literary perfection is not demanded of ALJs' opinions any more than it is required of federal judges. Were the rule otherwise, few decisions could pass muster. It is enough that an ALJ's opinion enables the reviewing court to track the mode of analysis and determine its accuracy and logic. The ALJ's opinion in this case more than satisfies that test.

The plaintiff's motion for summary judgment is DENIED, and the Commissioner's motion is GRANTED.

DATE: 1/29/10

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE